In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1911

Faye Haugerud,

Plaintiff-Appellant,

v.

Amery School District,

Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99 C 515--John C. Shabaz, Judge.

Argued October 31, 2000--Decided August 2, 2001


   Before Bauer, Kanne, and Rovner, Circuit
Judges.

   Kanne, Circuit Judge.  Plaintiff-
appellant, a longtime custodial employee
of the Amery School District, alleges
that her employer discriminated against
her on the basis of her sex. She also
contends that the School District created
a hostile work environment and allowed
such an environment to persist. The
district court granted the defendant's
motion for summary judgment on both of
plaintiff's claims. For the reasons
stated below, we will affirm the grant of
summary judgment on plaintiff's sex
discrimination claim,  but reverse with
respect to her hostile work environment
claim. Because we are remanding for
further proceedings, we will also vacate
the district court's award of costs.

I.  History

   The Amery School District is a public
school district in Amery, Wisconsin with
one high school, two middle schools, and
one elementary school. Faye Haugerud
began working for the School District in
1978, and was hired as a full-time day
custodian at the older of the two middle
schools in 1982. She held that position
until 1992, at which time she transferred
to the new middle school. A 1996 School
District reorganization eliminated the
day position at the new middle school and

created a late-afternoon shift. In accordance with the collective bargaining agreement that existed between the School District and its custodial workers, plaintiff was given the opportunity to move to the later position or to transfer into another custodial position in the School District. Plaintiff had enough seniority to permit her to transfer into a daytime custodial position at the high school and when she transferred, she bumped Norm Fougner, a male custodian, out of his position.

Fougner had several conversations with Ray Norsted, the District Administrator of the Amery School District, in which Fougner questioned Haugerud's ability to be a day custodian at the high school. Norsted, who was in charge of human resources issues for the School District, told Fougner that he would try to get his job back for him. On November 25, 1997, Norsted told Haugerud that the custodial changes implemented in 1996 were not working out and asked her to voluntarily give up her position at the high school, so that Fougner could return to it. Haugerud refused. Plaintiff received performance evaluations for 1997 and 1998 that indicated her work was satisfactory/meets expectations.

In August of 1998, two of the three daytime custodial positions at the high school were eliminated in order to match the day custodian schedules at the other three District schools. Norsted advised the custodial staff, before any bumping began, that more maintenance work would be required of the daytime custodians than had been required prior to the reorganization. Norsted also told the staff to make sure they were qualified for any position they selected. Plaintiff felt that, based on her work experience, she could handle any of the available custodial jobs. She thus transferred back to a day position at the intermediate school.

When LaDonna Clark, the one remaining day custodian at the high school, left on sick leave, Fougner filled in for her. Shortly thereafter, in October 1998, Clark decided to take early retirement. Haugerud's seniority allowed her to take Clark's vacated position, which she elected to do. As a result, Haugerud again bumped Fougner out of his position

at the high school.

At the time Haugerud elected to return to the high school, the high school principal, Dean Sanders, sent a memorandum to Norsted asking that Haugerud not be allowed to return because she was not qualified. Sanders sent the memo based on his "professional judgment that Haugerud could not perform the required maintenance tasks." Sanders did not ask Joe Mara--the custodial and maintenance supervisor--for his opinion or judgment regarding Haugerud's ability./1 Haugerud sent a letter to Norsted and to a number of school board members in which she protested Sanders's request. Though Haugerud was subsequently allowed to bump into the day custodial position at the high school, Sanders and Norsted extended her period of probation (beyond the twenty day trial period mandated by the custodian's union contract). Haugerud passed her probation and is, to date, the day custodian at the high school.

From the time Haugerud returned to the high school, she was the target of numerous discriminatory and harassing incidents. In her view, these incidents can be divided into four different groups. First are statements that allegedly evidence the intent of Norsted and Fougner to force her to give up her day custodial position at the high school so that Fougner could take it. Norsted asked Doug Anderson, a long-time custodian, why he had not talked to plaintiff before she chose to return to the high school, stating that "you know as well as I know that she cannot do the job." Anderson later overheard a conversation between Fougner and Norsted during which they talked about assigning Haugerud extra maintenance duties. Anderson understood this to mean that Haugerud would be assigned duties Fougner had not been required to do. Robert Thompson, another custodian, came upon Fougner when he was writing up a work schedule; Fougner said that he was writing it up so that there was "no way in hell" that Haugerud could do the job on day shift, stating that "this is what Dean [Sanders] and I want." Two other custodians--Joe Drinkman and Bob Thompson--also recounted conversations in which Fougner had said that "no woman could do my job," that he was going to

get his job back because Norsted had promised it to him, and that women working in the kitchen at the high school should not get the same pay as men.

Second, Haugerud asserts that a) the School District issued express instructions in 1998 that male custodians were not to assist female custodians and b) the maintenance people would not assist her with maintenance tasks even though her job is primarily custodial. With respect to the first allegation, there is no written evidence of this pol icy, although a number of individuals testified to its existence. Joyce Peterson said that Mara told her, in an August 1998 meeting also attended by Cheryl Meyer, that "the Board was very adamant about the night men not helping the day ladies," i.e., the male custodians were not to help the female custodians. Peterson Dep. at 70-72. Also in the fall of 1998, three male custodians--Wes Bader, Wayne Jones, and Keith Bader--told Clark that they were told not to help any of the female custodians. Clark Dep. at 38-40. With respect to the second allegation, Norsted criticized Brian Elkin (the maintenance, heating, ventilation, and air conditioning specialist for the School District) and Mara (Elkin's direct supervisor) in the fall of 1998 for doing more maintenance work at the high school than at other schools. While Elkin did not think this was true, Norsted's critique nonetheless caused him to be more cautious about assisting Haugerud with maintenance tasks. Elkin has attempted to help her but has been told by Mara that Haugerud should do the maintenance tasks herself, though Mara did not make such comments when Elkin helped male custodians with similar tasks. Both Mara and Elkin do maintenance work for Leland Paulson, the female day custodian at the elementary school, but Mara is reluctant to help Haugerud to the same extent. Mara told Thompson that Haugerud "was going to have to make it on her own, sink or swim." Thompson Dep. at. 66. Haugerud has requested assistance from the maintenance department on an as needed basis since the fall of 1998, but often does not hear back or receives a delayed response. Haugerud asserts that she specifically asked Sanders for help to assemble a desk in 1999, a task that required more than one person, but he did

not respond and she was forced to enlist the assistance of her husband. The same year she was instructed to install a window, which was also not a one person job--it took two people to even bring it into the high school. Nonetheless, Mara instructed Elkin that he was not to help Haugerud with the window.

Third, plaintiff asserts that she was given duties and responsibilities that were not given to the male custodians. Generally, the night custodians are responsible for cleaning the bathrooms at the high school. When Elkin noticed that the bathrooms were not cleaned for several weeks, in the fall of 1998, he reported it to Mara. Rather than requesting the night custodians (who are male) to clean the bathrooms, Sanders told Haugerud to do it. Plaintiff is now required to clean restrooms at the high school though the male day custodian at the middle school, Joe Drinkman, is not required to do so. The record does not reflect whether the other two female day custodians in the School District are also responsible for cleaning bathrooms.

Plaintiff's male co-workers at the high school have failed to assist in shoveling snow, a task not assigned to any particular shift. Plaintiff asked Sanders to enlist their assistance in the fall of 1998, but they still do not assist, and Sanders has done nothing to remedy the problem. In 1998 and 1999, Haugerud and the two other female custodians at the high school, including a female night custodian, were required to shovel snow in all of the entrances to the high school, while the male custodians were not. Snow removal can take plaintiff up to 2 hours, and therefore it interferes with her ability to complete other assigned responsibilities.

The School District has also required Haugerud to perform a variety of maintenance tasks that were traditionally performed by outside contractors or the maintenance department. In 1999, plaintiff was instructed to fix doors that had been newly installed by a door manufacturer, despite the fact that the company from which the doors were purchased should have fixed the doors. Male custodians have not been required to fix doors. She was also asked to install a window, as we noted above, and to

construct a box to hold gym equipment, both projects that would have been done by the maintenance department prior to plaintiff's arrival at the high school as the sole day custodian.

Fourth, plaintiff alleges that her supervisors and co-workers have intentionally interfered with the performance of her work duties. From 1998 to 2000, Sanders frequently summoned plaintiff by beeping her, notwithstanding the 1998 implementation of a work order system intended to decrease the inefficiencies associated with frequent beeping of the custodians. There were also several instances of other custodians hiding the equipment, tools, and supplies necessary for Haugerud to do her job. Sanders asked plaintiff to change the air filters throughout the high school, and told her that there was a book indicating the location of all these filters. When plaintiff could not find the book, Fougner told her that he had thrown the book away or taken it home in a box. To change some of the filters, plaintiff also needed access to a locked room. When she asked Mara for a key to the room, he indicated that there was not a key or, if there was one, that the key had been "thrown away." As it turned out, another custodian (Doug Anderson) had a key and eventually opened the door for plaintiff.

Plaintiff describes other instances in which she was treated differently than her male colleagues. When plaintiff worked as a day custodian at the middle school, if the night custodians complained about something not being done, Mara would criticize plaintiff but would not say anything to the senior day custodian, Joe Drinkman. In the fall of 1999, while plaintiff worked at the high school, Sanders approached her in the hallway and, in the presence of students, spoke to her in a very loud, angry, and abusive manner. A teacher who witnessed the incident, Judy Collins, stated that she had never observed Sanders treat a male employee at the high school in the same way.

Plaintiff also points to the experiences of the other female custodians. Theresa Gaudette transferred out of the high school in March 1999 due to an allegedly hostile work environment. During the four

months she worked as a night custodian (from October 1998 to February 1999) Gaudette noticed that she was assigned a heavier workload than were her male co-workers. She was required to shovel snow, though the male night custodians were not required to do so--only the female custodians shoveled snow. Gaudette was subjected to verbal abuse and cornered by two of the male custodians, one of whom challenged her to hit him. When she informed Sanders of the incident his only response was to instruct Gaudette and the other female custodians not to talk to the male custodians. The male custodian that took Gaudette's place, Darold Lundgren, was not required to perform many of the duties that she had been required to perform.

From 1992 through the time of his resignation in 1999, Brian Hinke (a custodian and close friend of Mara) made derogatory comments about women, stating that they were not qualified to do their job because they were women and that they should not be paid as much as men. He also allegedly hid tools and equipment to make it more difficult for the female custodians to do their jobs. Though the comments were made in Mara's presence, no action was taken to correct or remedy the comments. Likewise, Norsted heard Hinke and the other male custodians make similar comments. While he thought the comments were inappropriate, he did not take any action. Thompson also witnessed occasions in 1998 and 1999 when Hinke and Jim Frederic stated that Haugerud was "nothing more than a fat-ass bitch."/2

Two co-workers and plaintiff's husband complained to the School Board on Haugerud's behalf. Mary Nevala, a longtime school employee who retired in 1996, called two Board members (Sid Bjorkman and Jane Johnson) in December of 1998 to inform them of the administration's harassment of plaintiff. Both members said that they would "look into it." Drinkman had three to four conversations with Bjorkman in which he told Bjorkman that there was a problem with the way Mara treated the female custodians, and that there was a disparity in what was expected from the male and female custodians. Bjorkman said he would "check into it." In 1993, Drinkman also told Al Moe, another Board member, that Haugerud was being treated

poorly by Mara and Hinke. Moe indicated that he would talk to Norsted about the issue. Finally, Jim Haugerud, plaintiff's husband, called Jane Johnson in 1997 or 1998 to discuss problems that plaintiff was having at work. He told her that plaintiff was being treated poorly by her male co-workers.

The School District has had a policy governing sexual harassment complaints since 1991. In addition to setting forth the internal complaint procedure, the policy states: "In addition to or instead of this complaint procedure, the complainant has a right to file a charge of discrimination with the [EEOC Office of Civil Rights or the Equal Rights Division of the Department of Industry, Labor and Human Relations]." In accordance with this policy, plaintiff filed a charge of discrimination with the Equal Rights Division (ERD). Her ERD complaint was then filed with the federal Equal Employment Opportunity Commission (the EEOC).

Plaintiff filed a complaint in the United States District Court for the Western District of Wisconsin, claiming that defendant discriminated against her and subjected her to a hostile work environment because of her gender. The School District moved for summary judgment and the district court granted the motion on March 7, 2000. Costs of $7,072.93 were awarded on April 14, 2000. Plaintiff appeals this decision.

II. Analysis

A. Standard of Review

We review grants of summary judgment de novo. See Myers v. Hasara, 226 F.3d 821, 825 (7th Cir. 2000). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In determining whether a genuine issue of material fact exists, we construe all facts and inferences in the light most favorable to the non-moving party,

drawing all reasonable and justifiable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A court should not grant summary judgment, in a discrimination case or otherwise, when there are contestable issues of material fact. See Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1396 (7th Cir. 1997).

B.  Allegations Within the Scope of Review

  Defendant contends that much of plaintiff's federal complaint is beyond the scope of her EEOC complaint and should not be considered by the court. "[A] Title VII plaintiff may bring only those claims that were included in her EEOC charge, or that are like or reasonably related to the allegations of the charge and growing out of such allegations." McKenzie v. Ill. Dep't. of Transp., 92 F.3d 473, 481 (7th Cir. 1996) (internal quotation and citations omitted). "The claims are not alike or reasonably related unless there is a factual relationship between them. This means that the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals." Cheek v. W. & S. Life Ins. Co., 31 F.3d 497, 501 (7th Cir. 1994). "This rule serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation and persuasion, and of giving the employer some warning of the conduct about which the employee is aggrieved." Id. at 500 (citations omitted). Additionally, we have recognized that employees often file the EEOC charge without the assistance of a lawyer, thus "a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." Id.

  In light of these standards, we find that plaintiff's allegations are reasonably within the scope of her ERD/EEOC complaint. Plaintiff's complaint alleged that the School District, through its reorganizations, was eliminating jobs that were held by women, which is certainly different than the thrust of the federal suit. However, this was not all her ERD complaint alleged:

Workload and duties were created [for the women] after choosing work site. Job duties and new maintenance assignment have created such [ ] stress and low self esteem that two of the women will be retiring Oct. 1. Stress from all the workload and no training in maintenance, low self esteem from male co-workers making negative remarks about [how] women should not receive the same pay as men, [and that] women should be in a different classification. Accused of not carrying our workload. For the past year and a half my workload has been increased and with the start of this school year my workload has become outrageous and impossible to complete on a daily schedule.

The allegations of newly imposed maintenance assignments, negative comments, and an increased workload are all allegations made in the federal complaint. Further, the School District had no reason to be surprised by the nature of her legal claims, because her ERD complaint stated that it was based on "sex discrimination and harassment." Cf. Cheek, 31 F.3d at 503-04 (finding that plaintiff had not provided ample notice to her employer that she was complaining of a hostile work environment because that claim could not even be inferred from her complaint). While many of the events discussed in plaintiff's brief occurred after she filed her complaint, most of them occurred shortly after, in late 1998 and early 1999, and they are all the types of incidents that one would reasonably expect to be discovered during the course of an EEOC investigation into the allegations in the charge. See id. at 500 (citing Jenkins v. Blue Cross Mut. Hosp. Ins., Inc., 538 F.2d 164, 167 (7th Cir. 1976) (en banc)).

   Finally, the Board contends that plaintiff is time-barred from relying on any evidence of harassment occurring more than 300 days prior to the date she filed her EEOC charge. See 42 U.S.C. sec. 2000e-5(e)(1); Wis. Stat. sec. 111.39(1) (2001). Plaintiff filed her ERD complaint on September 24, 1998; thus, events occurring prior to November 28, 1997 would be excluded from consideration. This would prevent review of some of the alleged events (her ERD complaint alleges that the discriminatory and harassing

actions began in December of 1996), including Fougner's questioning of Haugerud's ability to be a day custodian; Norsted's conversation with Haugerud, on November 25, 1997, in which he asked her to give up her position so that Fougner could return to it; and Hinke's derogatory comments. These events seem to lay the foundation for the events that followed, however, and could arguably be considered as part of "a single, continuing course of harassment." Saxton v. AT&T, 10 F.3d 526, 532 n.11 (7th Cir. 1993). The continuing violations doctrine allows a court to consider as timely all discriminatory conduct relevant to a claim, so long as there is sufficient evidence of a "pattern or policy of discrimination." Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 344 (7th Cir. 1999), cert. denied, 528 U.S. 874, 120 S. Ct. 178, 145 L. Ed. 2d 150 (1999). As the district court did not address the issue, and the School District only makes the bare assertion that events outside the 300 days should not be considered, "we will not undertake to parse [plaintiff's] claims in an effort to weed out time-barred incidents." Saxton, 10 F.3d at 532-33 n.11; see also Young v. Will County Dept. of Pub. Aid, 882 F.2d 290, 292 (7th Cir. 1989) ("All doubts on jurisdictional timeliness are to be resolved in favor of trial."). Thus we will consider all incidents presented in plaintiff's complaint and appellate briefs./3

C.  Title VII Claims

1.  Sex Discrimination Claim

   Plaintiff alleges that the School District discriminated against her on the basis of her sex, in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. sec. 2000e-2(a)(1). Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Id. Thus, there are two primary issues toconsider: first, was the purported difference in treatment prompted by plaintiff's sex, and second, did the difference in treatment affect plaintiff's compensation, terms, conditions, or privileges of employment.

See Sweeney v. West, 149 F.3d 550, 554 (7th Cir. 1998). "If there is enough evidence for a reasonable jury to conclude that the plaintiff's sex . . . prompted the disparate treatment (and that the treatment affected the plaintiff's employment in a tangible way), then the case is suited for trial, not summary judgment." Id.

Plaintiff may establish a violation of Title VII by presenting evidence of discriminatory intent, whether it be direct or circumstantial, or she may proceed under the McDonnell Douglas burden-shifting method. Either way, however, the plaintiff must prove that her "terms, conditions, or privileges of employment" were affected, 42 U.S.C. sec. 2000e-2(a)(1); that is, she must show that she suffered a materially adverse employment action. See Russell v. Bd. of Trs. of the Univ. of Ill., 243 F.3d 336, 341 (7th Cir. 2001); Sweeney, 149 F.3d at 554. Determining what is materially adverse will normally "depend on the facts of each situation." Bryson v. Chi. State Univ., 96 F.3d 912, 916 (7th Cir. 1996). A wide variety of actions can qualify, "some blatant and some subtle." Id. at 916 (citation omitted). While what is considered adverse is defined broadly, "not everything that makes an employee unhappy is an actionable adverse action." Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996); but see Collins v. State of Ill., 830 F.2d 692 (7th Cir. 1987) (holding that an "adverse job action is not limited solely to loss or reduction of pay or monetary benefits"). In assessing adversity, we may examine both quantitative and qualitative changes in the terms or conditions of plaintiff's employment. See Dahm v. Flynn, 60 F.3d 253, 257 (7th Cir. 1994).

Plaintiff alleges that she suffered adverse employment actions within the meaning of Title VII when the School District 1) tried to force her to give up her custodial position, 2) told the male night custodians not to help the female day custodians, 3) gave her additional responsibilities above what was expected of the male custodians and above that which she should have reasonably have been given, and 4) intentionally interfered with the performance of her work duties. While many of these instances might have indeed been

harassing, as we discuss below, none of them resulted in any materially adverse change in the terms, conditions, or privileges of plaintiff's employment. Plaintiff has not been disciplined, demoted, or terminated; has not been denied wage or employee benefit increases or been given less opportunity for such increases; and has not had her job responsibilities reduced or been made to perform more menial tasks. She transferred into the high school on the basis of her seniority under the collective bargaining agreement, and has not been transferred since then. Though she did receive an extra period of probation following her transfer in 1998, she completed the probationary period without incident and continues to hold the day custodial position at the high school. In short, no material harm has resulted from any of the challenged actions. Thus we agree with the district court that plaintiff suffered no adverse employment action and can not make out a case of sex discrimination. See also Parkins v. Civil Contractors of Ill., Inc., 163 F.3d 1027, 1039 (7th Cir. 1998) (finding that "an adverse employment action might occur when an employer orders its employees to shun the plaintiff, provided that this activity causes material harm to the plaintiff"). Cf. McKenzie v. Ill. Dept. of Transp., 92 F.3d 473, 484 (7th Cir. 1996) (finding that, in the context of a retaliation claim, it was an adverse action for a supervisor to tell an employee in the accounting office to stop hand delivering invoices to plaintiff's office). We will affirm the district court's grant of sum mary judgment on this issue.


2.   Sexual Harassment in the Form of a Hostile Work Environment

a.   Plaintiff's Claim

   Plaintiff also alleges that the School District created a hostile work environment that constitutes sexual harassment. "An employer violates Title VII when 'discrimination based on sex . . . create[s] a hostile or abusive work environment.'" Adusumilli v. City of Chi., 164 F.3d 353, 361 (7th Cir. 1998) (quoting Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)), cert. denied, 528 U.S.

988, 120 S. Ct. 450, 145 L. Ed.2d 367 (1999). Our inquiry turns on whether the alleged harassment occurred because of the sex of the complainant, thus we ask whether she was "'exposed to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed.'" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 25, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (Ginsburg, J. concurring)). Harassment is not limited to acts of sexual desire, see Smith v. Sheahan, 189 F.3d 529, 534 (7th Cir. 1999); Shepherd v. Slater Steels Corp., 168 F.3d 998, 1008 (7th Cir. 1999) (quoting Oncale, 523 U.S. at 80), but rather is a broad term which "encompasses all forms of conduct that unreasonably interfere with an individual's work performance or create an intimidating, hostile, or offensive working environment." McKenzie v. Ill. Dep't. of Transp., 92 F.3d 473, 479 (7th Cir. 1996) (citing Meritor Sav. Bank, 477 U.S. at 64).

Workplace harassment "must be sufficiently severe or pervasive" to be actionable. Meritor Sav. Bank, 477 U.S. at 67 ("[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment."); Russell v. Bd. of Trs. of the Univ. of Ill., 243 F.3d 336, 342-43 (7th Cir. 2001) ("In order to survivesummary judgment on a hostile work environment claim, a plaintiff must present evidence that would establish that the allegedly hostile conduct was so severe or pervasive as to create an abusive working environment in violation of Title VII."). We have recognized, however, that harassment need not be both severe and pervasive--one extremely serious act of harassment could rise to an actionable level as could a series of less severe acts. See Smith, 189 F.3d at 533-34.

To prevail on a hostile environment claim, the plaintiff must show that the work environment was both subjectively and objectively hostile. See Harris, 510 U.S. at 21-22. The requirement of subjectivity is intended to ensure that the plaintiff did actually feel harassed, because "if the victim does not

subjectively regard the environment as abusive, the conduct has not actually altered the victim's employment and there is accordingly no Title VII violation." McKenzie, 92 F.3d at 479 (citing Harris, 510 U.S. at 20-22). An objectively hostile work environment is one that a reasonable person would find hostile or abusive. See Adusumilli, 164 F.3d at 361. In determining whether a plaintiff has met this standard, a court must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23; see also Russell, 243 F.3d at 343; Smith v. Sheahan, 189 F.3d 529, 533-34 (7th Cir. 1999). We have made clear that Title VII "do[es] not mandate admirable behavior from employers," Russell, 243 F.3d at 343, thus "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Adusumilli, 164 F.3d at 361 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)); see also Russell, 243 F.3d at 343-44 (citing a number of Seventh Circuit cases which held that various statements "were not so offensive as to constitute actionable conduct"); Saxton v. AT&T, 10 F.3d 526 (7th Cir. 1993) (holding that conduct "was not so severe or pervasive as to create an objectively hostile work environment").

The point of all this language, much of which we have already commented on in other cases, is to assist judges in determining which claims deserve to survive summary judgment and go to trial. Thus we must decide whether a reasonable trier of fact could find that plaintiff was harassed, that she was harassed because of her sex, and that the conduct was severe or pervasive enough to create a subjectively and objectively hostile work environment. See Mazzei v. Rock 'N Around Trucking, Inc., 246 F.3d 956, 959 (7th Cir. 2001) ("[S]ummary judgment is improper [ ] if a reasonable jury could return a verdict in favor of the nonmoving party.") (citation omitted). We thus turn to that task, reviewing all of plaintiff's evidence in the light most

favorable to her.

The following are the primary factual allegations made by the plaintiff with regard to her hostile work environment claim:

1. The high school principal, Sanders, asked the superintendent, Norsted, not to allow plaintiff to return to the high school because she was not qualified. This request was made notwithstanding plaintiff's satisfactory evaluations and without consulting plaintiff's supervisor.

2. Norsted, the School District superintendent, promised Fougner, the male custodian that plaintiff bumped when she returned to the high school, that he would get his job back.

3. Fougner told another custodian that he was writing up a schedule for plaintiff that there was "no way in hell" she would be able to handle.

4. The School District told the male custodians not to help the female custodians but did not give any similar directives to the female custodians.

5. Mara, the maintenance supervisor, criticized Elkin for helping plaintiff with maintenance tasks but did not do so when Elkin helped the male custodians.

6. When plaintiff requested assistance from the maintenance department, she received either delayed assistance or no assistance. There is no evidence that the male custodians had similar problems.

7. Plaintiff was told to assemble a desk and install a window by herself, both of which were two person jobs. There is no evidence that any of the male custodians were asked to perform similar maintenance tasks, by themselves or otherwise.

8. Plaintiff is now responsible for all snow shoveling, even though it is not assigned to a particular shift. Gaudette, a female night custodian, was required to shovel snow when she was working for the District, though the male night custodians were not. This task is time consuming and renders it more difficult to complete the required custodial tasks. Though plaintiff asked Sanders, the

school principal, to request that the male night custodians assist in snow removal, Sanders took no action.

9. Plaintiff has been required to perform a variety of maintenance tasks (fix a door, install a window, build a box for gym equipment) that were, prior to her move to the day custodial position, traditionally performed by outside contractors or the maintenance department.

10. On at least two occasions, male custodians hid the tools plaintiff needed to do her job.

11. The other female custodian at the high school, Gaudette, left due to the "hostile environment."

12. Norsted and Mara both heard the male custodians make a variety of derogatory comments about the female custodians-- asserting that they were not qualified to do their jobs as custodians and that they should not be paid as much as men--but neither took any action.

In summary, plaintiff presents a variety of incidents in which she--the only day custodian at the high school and the only female custodian at the high school since March of 1999--was harassed by the male superintendent, the male principal, her male supervisor, and the male night custodians. This harassment was not of a sexual nature but rather it was directed at the terms and conditions of her employment: questioning her abilities and the ability of women to do her job in general, plotting to give her job to a male custodian, increasing her duties in an attempt to make her quit, withholding necessary assistance, hiding the tools necessary to do her job, making discriminatory comments, and so forth. While none of these incidents were particularly severe, they are sufficiently pervasive, and they seem to have unreasonably interfered with her ability to do her job. See Harris, 510 U.S. at 23; cf. Russell, 243 F.3d at-343-44 (finding insufficient evidence to sustain a hostile environment claim, where most of the offensive comments were directed at plaintiff's co-workers and the few comments directed at plaintiff were minor); Adusumilli, 164 F.3d at 361-62 (finding that a few ambiguous comments, several touches to plaintiff's

finger and hand, and one possible poke to plaintiff's buttocks were not sufficiently severe or pervasive to be actionable); McKenzie, 92 F.3d at 480 (finding that three comments over a three month period were not frequent or severe enough to rise to the level of unreasonably interfering with plaintiff's work environment). Further, there is no evidence that men were subjected to this type of harassing behavior. Cf. Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340 (7th Cir. 1999) (holding that plaintiff was not singled out for abusive treatment because alleged harasser "was a crude individual who treated all of his coworkers poorly"), cert. denied, 528 U.S. 874, 120 S. Ct. 178, 145 L. Ed. 2d 150 (1999).

Plaintiff asserts that the work environment was subjectively hostile, and points to problems with sleep, depression, and weight gain, as well as several incidents in which she was brought to tears. It seems clear that she did "subjectively regard the environment as abusive," McKenzie, 92 F.3d at 479; see also Gentry v. Export Packaging Co., 238 F.3d 842, 851 (7th Cir. 2001), and there is no evidence to the contrary. The School District suggests that plaintiff should have to do more than declare that she was harassed, yet that is the whole point of the subjective inquiry: we inquire into whether the plaintiff perceived her environment to be hostile or abusive. See Faragher, 524 U.S. at 787. If she did, as is evident here, then we assess whether that feeling was reasonable. In this case, both the "frequency of the discriminatory conduct" and its "interfere[nce] with [plaintiff's] work performance" support a finding of objective hostility. See Harris, 510 U.S. at 23. Similarly situated others--those who were the only person of a certain sex or race in a workplace, who were treated differently than the other workers, and who were aware of disparaging references to their sex or race--would likely feel harassed by this type of pervasive behavior. Cf. Saxton v. AT&T, 10 F.3d 526, 534-35 & n.14 (7th Cir. 1993) (finding there was not an objectively hostile work environment where there were only two instances of offensive behavior and the behavior did not interfere with the plaintiff's work performance).

Determining whether plaintiff was treated differently because of her sex, as opposed to some other reason (for example, any difference in job descriptions among the custodial positions) is admittedly complicated by the fact that she is the only day custodian at the high school. Thus, it is difficult to compare what has been required of her with what is required of the night custodians, or the day custodians at the other schools. The incidents of discriminatory treatment towards plaintiff and the other women, however, are unmatched by similar reports of this type of conduct being directed toward men. It would be reasonable to conclude that a male day custodian with Haugerud's level of seniority would not have been treated the same way. The School District's primary argument in response is that "it has the contractual and managerial right to define job requirements for its daytime custodians [i]ncluding the discretion to add routine maintenance duties during the day shift that had not been previously required." First of all, this argument ignores the other types of harassment alleged by plaintiff, which we have mentioned above. Secondly, even if the School District has a contractual right to impose additional duties on plaintiff, this right is not absolute; Title VII would not permit the District to increase plaintiff's workload due to her sex. In the instant case, plaintiff challenges the District's contention that the day custodians are supposed to do more maintenance work than the night custodians by showing that the job descriptions are identical, at least with respect to required maintenance work: both descriptions say the custodians will "perform routine maintenance/repairs to building boiler systems, plumbing, and electrical equipment." Haugerud also states that her official job description did not change when she transferred to the day custodial position at the high school, thus there was nothing in writing suggesting that the new position would involve an increase in maintenance duties. Finally, she has presented evidence showing that the job duties for her position were increased when she took on the position, in comparison to the duties expected of the male custodian who held the position immediately prior to her (she also asserts that the job duties for a night

custodial position were decreased when Gaudette left and a man took her place).

Perhaps the final blow is that the School District has not denied or explained (at least on appeal) plaintiff's most damaging allegation: that the male custodians were told not to help the female custodians. No similar decree was given to the female custodians; in fact, the females were still expected to help the males (e.g., the women were required to shovel snow and the men were not, and plaintiff was told to clean the bathrooms after the men failed to clean them). If plaintiff's allegation is true, it would seem to constitute "discrimina[tion] . . . because of . . . sex." 42 U.S.C. 2000e-2(a)(1); Oncale, 523 U.S. at 80. It would be one thing to hold all employees accountable for their job duties, and to prohibit any employee from helping another, but a simple decree that the male workers not help the female workers would evidence intent to treat the custodians differently on the basis of sex.

The sum total of plaintiff's allegations--the school board decree, the discriminatory comments, the increased workload, the failure to assist plaintiff, and the evidence of attempts to hinder her performance of her job duties--could lead a reasonable trier of fact to find a "general hostility to the presence of women in the workplace." Oncale, 523 U.S. at 80. Undoubtedly, "[i]t is challenging to precisely define what constitutes a hostile work environment." Gentry, 238 F.3d at 850. The district court summarized plaintiff's factual allegations by stating that "two co-workers made comments to her that female custodians should not be paid as much as male custodians," and that she "contends that the high school principal talked to her once in an abusive manner." Haugerud v. Amery, No. 99-C-515-S, slip op. at 8 (W.D. Wis. March 7, 2000). The court then determined that "[t]hese actions are not so severe and pervasive as to alter plaintiff's working conditions." Id. We recognize that this is a close call. Nonetheless, we conclude that a reasonable fact finder could find that plaintiff was treated differently than her male colleagues because of her sex, in a manner that was both

subjectively and objectively harassing, and at a sufficient level of pervasiveness to trigger liability under Title VII.

b. The School District's Liability

Our inquiry, however, does not end with the determination that plaintiff has experienced a hostile work environment. A plaintiff must also show that the employer is liable for the discriminatory acts. See Smith v. Sheahan, 189 F.3d 529, 533 (7th Cir. 1999). Though the district court did not reach this issue, both parties discussed it on appeal, and our above conclusions mandate consideration of whether the School District could be held liable here. To hold an employer liable for co-worker harassment, a plaintiff must show "that it negligently failed to take reasonable steps to discover or remedy the harassment." Id. The standard for determining when an employer will be held liable for sexual harassment behavior of a supervisor was recently established by the Supreme Court:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence . . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

Faragher v. City of Boca Raton, 524 U.S. 775, 807-08, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998); see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). Although we do not "carve up the incidents of harassment" when determining

if the harassment was severe or pervasive, Mason v. S. Ill. Univ. at Carbondale, 233 F.3d 1036, 1045 (7th Cir. 2000), in order to determine whether the employer is liable we must distinguish between the harassment allegedly perpetrated by supervisors and that allegedly perpetrated by co-workers.

i.  Harassment by Supervisors

In line with traditional agency principles, an employer may be held vicariously liable for the acts of those who can be considered "an employer's proxy," such as "a president, owner, proprietor, partner, corporate officer, or supervisor 'hold[ing] a sufficiently high position in the management hierarchy of the company for his actions to be imputed automatically to the employer.'" Johnson v. West, 218 F.3d 725, 730 (7th Cir. 2000) (citing Faragher, 524 U.S. at 789-90). Plaintiff alleges harassment on the part of Norsted, the District Administrator, and Sanders, the high school principal./4 Plaintiff alleges that Norsted: 1) promised Fougner that he would get him his job back; 2) tried to force plaintiff to give up her position at the high school so that Fougner could return to it; 3) wrongfully extended her period of probation; 4) insinuated to a friend of plaintiff's that he should have talked plaintiff out of the move, stating that "you know as well as I know that she cannot do the job;" 5) conspired with Fougner to assign plaintiff "extra" maintenance duties; 6) tried to prevent the male maintenance workers from helping her (by criticizing Elkin and Mara for doing more maintenance work at the high school than at other schools); and 7) failed to take action when male custodians made harassing or discriminatory comments in his presence. Plaintiff alleges that Sanders: 1) tried to prevent her from being transferred to the high school for discriminatory reasons; 2) unnecessarily gave her probation; 3) conspired with Fougner to devise a work schedule that there was "no way in hell" she could complete during the day shift; 4) assigned her tasks that were impossible for one person to complete; 5) failed to respond to her requests for additional help; 6) gave her duties and responsibilities that were not given to the male custodians; 7) failed to take action to force plaintiff's male

co-workers to assist in shoveling snow; 8) beeped plaintiff on a frequent basis to disrupt her work; and 9) spoke to her in a very loud, angry, and abusive manner in front of students and teachers.

There is a "safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of her sex." Galloway v. Gen. Motors Serv. Parts Operations, 78 F.3d 1164, 1168 (7th Cir. 1996). We have continued to recognize such a haven in the post Ellerth/Faragher era. See Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 346 (7th Cir. 1999), cert. denied, 528 U.S. 874, 120 S. Ct. 178, 145 L. Ed. 2d 150 (1999); Adusumilli v. City of Chi., 164 F.3d 353, 362 (7th Cir. 1998). We do not think, however, that this case falls into the safe harbor because the numerous incidents, taken together, could indicate a pervasively hostile work environment. While plaintiff does not allege that Norsted and Sanders made overtly discriminatory comments, there is enough evidence in the record to support an inference of sex discrimination.

Thus we proceed to the Ellerth/Faragher framework. "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor . . . ." Faragher, 524 U.S. at 807. A tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 761; see also Murray v. Chi. Transit Auth., 252 F.3d 880, 887 (7th Cir. 2001); Molnar v. Booth, 229 F.3d 593, 600 (7th Cir. 2000); Ribando v. United Airlines, 200 F.3d 507, 510-11 (7th Cir. 1999). In short, "[a] tangible employment action has to cause a substantial detriment to the plaintiff's employment relationship." Savino v. C.P. Hall Co., 199 F.3d 925, 932 n.8 (7th Cir. 1999). This is akin to the requirement that an employment action must be materially adverse, see id., see also Murray, 252 F.3d at 888, and we have already determined that plaintiff suffered no such action. Cf. Molnar, 229

F.3d at 600 (holding that jury could find that taking art supplies away from plaintiff, who was interning as a junior high school art teacher, was a tangible employment action). Thus we must determine whether the School District is entitled to raise an affirmative defense. "The Ellerth/Faragher affirmative defense places the burden on the employer" to establish, by a preponderance of the evidence, two elements. See Gentry v. Export Packaging Co., 238 F.3d 842, 846 (7th Cir. 2001); see also Savino, 199 F.3d at 932.

First, the employer must establish that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." Faragher, 524 U.S. at 777-78. One method of demonstrating the exercise of reasonable care is to show the existence of an effective "antiharassment policy with complaint procedure." Id. Defendant has stated that a sexual harassment policy with complaint procedure was in place throughout the relevant time period, that this policy was distributed to employees, and that ASD occasionally held in-service meetings with staff to review the policy. Plaintiff has not disputed these facts, nor does she assert that the policy was somehow ineffective or deficient. See id. at 808 (holding that the City could not have exercised reasonable care where it "had entirely failed to disseminate its policy" and "there was no assurance that harassing supervisors could be bypassed in registering complaints"); Gentry, 238 F.3d at 847, 848 (holding that a policy must provide for "effective grievance mechanisms" and that Title VII requires the employer to "take[ ] the necessary steps to fully and effectively implement its sexual harassment policy"). Instead, she alleges that the District did not exercise reasonable care because it never took any action in response to the complaints made by plaintiff's husband and co-workers, prior to the time plaintiff filed her ERD complaint. We have considered at least one case in which the plaintiff argued that the employer did not exercise reasonable care because it did not take corrective action prior to the time plaintiff filed her complaint. See Hill v. Am. Gen. Fin. Inc., 218 F.3d 639 (7th Cir. 2000). The plaintiff in Hill sent the company a number of letters in which she

represented herself as a customer and complained about her boss's harassing behavior. See id. at 641. When the human resources department conducted an investigation, it was suspected that the plaintiff-employee had written the letters but she did not acknowledge that she had. See id. Two months after the initial letter, plaintiff finally sent a letter, signed in her own name, setting out the instances of harassment. See id. at 642. We determined that the plaintiff did not notify the company of the harassment until she sent the letter in her own name because the earlier letters "were not a reasonable effort at notification" and "she did not acknowledge that she had written those letters when the company investigated the complaints set out in the letters." Id. at 643. That situation is somewhat distinguishable from a situation such as this, where people complained on plaintiff's behalf and with plaintiff's knowledge. In any event, whether we could find that the School District was on notice once Drinkman and plaintiff's husband complained to the School Board members on plaintiff's behalf is not an issue we need to resolve today because, even after the Board was notified by plaintiff (when she filed her complaint on September 24, 1998), it did nothing. No internal investigation was pursued and no remedial action was taken. The School District does not attempt to argue otherwise.

What the School District does argue, repeatedly, is that plaintiff did not file a written complaint of sexual harassment with the District prior to filing her charge of employment discrimination with the EEOC. This pertains to the second element of the employer's affirmative defense, in which the employer must show that "the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807. An employee's "unreasonable failure to use any complaint procedure provided by the employer" would indicate that she "failed to fulfill [her] obligation of reasonable care to avoid harm." Id. at 778. Here, however, plaintiff did not fail to take advantage of the Board's sexual harassment policy. That policy allows

complainants to "file a charge of discrimination" with the Equal Rights Division "[i]n addition to or instead of [using the internal] complaint procedure." As the plaintiff's decision to file an external complaint rather than filing a complaint with the Board was in accordance with the Board's own policy, the Board can not now allege that plaintiff did not fulfill her obligation of reasonable care.

We thus conclude, as a matter of law, that the Board "could not be found to have exercised reasonable care" to prevent Norsted's and Sanders' harassing conduct and is thus not entitled to present an affirmative defense to plaintiff's claim that she was subjected to a hostile work environment by her supervisors. See Faragher, 524 U.S. at 809.

ii. Harassment by Co-Workers

Plaintiff also alleges that she was harassed by her co-workers, and that their harassment, coupled with that of her supervisors, created a hostile work environment. Employers are only liable for co-worker harassment if the plaintiff demonstrates that the employer was negligent in some fashion. See Adusumilli v. City of Chi., 164 F.3d 353, 361 (7th Cir. 1998). "In hostile work environment cases, the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." Tutman v. WBBM-TV, Inc., 209 F.3d 1044, 1048 (7th Cir. 2000), cert. denied, ___ U.S. ___, 121 S. Ct. 777, 148 L. Ed. 2d 675 (2001).

As we have already noted, however, the School District has not presented evidence that it took any type of corrective action once plaintiff filed her ERD complaint. Thus, this is not like the majority of the cases we consider, in which plaintiff contests the efficacy of the employers response; see, e.g., Shaw v. AutoZone, Inc., 180 F.3d 806, 811-12 (7th Cir. 1999), cert. denied, 528 U.S. 1076, 120 S. Ct. 790, 145 L. Ed. 2d 666 (2000), this is a case where the employer simply did not act. We conclude that a reasonable fact finder could find that the School District's failure to take any steps to investigate plaintiff's

allegations or to act on them in any way constituted negligence.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment with respect to plaintiff's sex discrimination claim, REVERSE with respect to her hostile work environment claim, VACATE the district court's award of costs, and REMAND for proceedings consistent with this opinion.

FOOTNOTES

/1 At some point in 1998, Mara gave up responsibility for directly supervising custodians. As a result, Mara's title changed from "custodial and maintenance supervisor" to "maintenance supervisor" and Sanders was given responsibility for supervision of the custodial workers.

/2 In plaintiff's written response to particular questions of the Equal Rights Officer assigned to her claim, she noted that a consultant from B&G Consultants had been hired by the School District to evaluate the custodial positions. During a presentation to the staff, the consultant stated that "she had never worked with such a chauvinistic group and found their treatment of women to be unacceptable." Plaintiff's Written Response to ERO's Questions para. 19.

/3 Defendant also alleges that many of the statements plaintiff relies upon constitute inadmissable hearsay. Defendant's motion for summary judgment did not discuss this aside from noting, in the conclusion, that a party can not rely upon inadmissable hearsay in an affidavit or deposition to defeat a motion for summary judgment. Defendant has not directed this court's attention to any particular statements that should be reviewed. The district court did not rule that any statements were inadmissable, and did not comment on the alleged hearsay in its opinion. For the purposes of our review, then, we consider all of plaintiff's evidence. While it is possible that, on remand, the district court might rule certain statements inadmissable, there is a sufficient amount of non-hearsay evidence to support our findings.

/4 Joe Mara, plaintiff's former supervisor who later relinquished supervisory authority over the custodians, would not fall into the category of employees for whom the School District could be held vicariously liable; he was a "low-level supervisor" rather than a "high-level manager." Johnson, 218 F.3d at 730. Thus, we will consider

whether the School District can be held liable for his acts in the following section under the standard for the employer's liability for acts of co-workers.