Gary HERRON, Plaintiff,

v.

**DAIMLERCHRYSLER CORPORATION,**
Defendant.

**IP00–1838–C B/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

June 3, 2003.

Gregory A. Stowers, Stowers, Weddle & Henn, Indianapolis, IN, for Plaintiff.

Susan B. Tabler, Ice Miller, Indianapolis, IN, for Defendant.

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BARKER, District Judge.

### I. *Introduction.*

This is an employment discrimination case brought pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981 and the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000e-et seq. and 1981a. The plaintiff, Garry Herron, an African–American, alleges that his employer, DaimlerChrysler, discriminated against him on the basis of his race by subjecting him to unfavorable terms and conditions of employment, harassed him on the basis of his race, and then retaliated against him for complaining about his ill treatment. He alleges that his working conditions became intolerable so that he was forced to resign.

The case is before us on DaimlerChrysler's motion for summary judgment. For the following reasons, we GRANT DaimlerChrysler's motion.

### II. *Statement of Facts.*

#### A. *Background.*

We recite the following facts in a light reasonably most favorable to Mr. Herron as the party opposing summary judgment.

DaimlerChrysler hired Mr. Herron in May 1994 as an hourly production employee at its Kokomo Transmission Plant (KTP). At its KTP facility, DaimlerChrysler machines parts and assembles transmissions. These functions are carried out in departments, which are identified by number. Any given part might be sent through several different departments before it is sent to the assembly area where the transmissions are built.

In December 1994, Mr. Herron, a graduate of Indiana University, was promoted to a position as a Production Supervisor. The Kokomo facility is organized hierarchically. Production supervisors, such as Mr. Herron, operate on the front lines, overseeing the work of the hourly production employees on each shift. A "lead supervisor" may help coordinate the activities of the supervisors on the various shifts. Area managers oversee and evaluate the supervisors; manufacturing managers (who also are referred to as "business managers") oversee and evaluate the area managers; and a plant manager oversees and evaluates the manufacturing managers. According to Manufacturing Manager, William Schaefer, the plant manager and business managers had little contact with production supervisors or hourly employees. The plant manager and business manager were not located in the same area as the area managers, production supervisors, and hourly employees. Area managers were responsible for evaluating production supervisors; the business manager had to approve those evaluations.

Ex. F (Smith Aff.), ¶¶ 5–7; Ex. B (Hall Dep.), pp. 8–10, 13; Ex C (Schaefer Dep.), pp. 11–14.

Each production supervisor is responsible for making a certain number of parts to feed to the assembly lines where the transmissions are made. If the production goal is not met, the result is "lost builds," a costly failure. From June 1997 to September 1997, for example, Department 8600 lost 872 builds at a total cost of $122,080.00. Supervisory personnel were subject to annual written performance reviews. Since Mr. Herron's appraisals are a significant element in this lawsuit, we address the evaluation form in some detail. Herron Aff., ¶¶ 7–9; Clark Dep. p. 7; Anderson Dep., pp. 12–13; Hall Dep., pp. 10,14–18.

According to Stipulated Exhibit No. 1, the appraisal form consists of five categories: (1) Supervisor's Assessment of Results; (2) Behavior Ratings; (3) Supervisor Comments; (4) Employee Comments; and (5) Signatures. Each category, in turn, consists of several elements, so that the evaluation form appears substantially as follows (omitting non-essential, details):

1. Supervisor's Assessment of Results.

 a. Role Model: Consistently produced outstanding results based on goals and ongoing job responsibilities.

 b. Significant Contributor: Consistently produced more than satisfactory results based on goals and ongoing job responsibilities.

 c. Contributor: Consistently produced satisfactory results based on goals and ongoing job responsibilities.

 d. Development Needed: Consistently produced less than satisfactory results based on goals and ongoing job responsibilities.

2. Behavior Ratings.

 a. Role Model

 b. Highly Effective

 c. Effective

 d. Development Needed

 e. Cannot rate or not applicable

 Supervisor Rating: This is the Supervisor's rating of the employee's behavior, which constitutes one-third of the individual and overall behavior ratings. Each rating is converted to a numerical score for calculation:

 Role Model = 4, Highly Effective = 3, Effective = 2, Development Needed= 1

3. Supervisor Comments.

This space is provided for free-form comments by the supervisor. The supervisor may provide, for example, a summary of the appraisal data, overall comments or suggestions on the employee's performance, comments regarding employee development, or other relevant comments not addressed in the body of the appraisal document.

4. Signatures.

Both the supervisor and employee are expected to sign and date the appraisal form. For the employee, the signature (as is stated on the document) is merely an acknowledgment that he or she has discussed the appraisal with the supervisor. An employee signature is not necessarily meant to imply concurrence with the ratings of comments. Therefore, even an employee who is dissatisfied with the appraisal should be encouraged to sign the document.

An employee's rating may affect whether he or she gets a raise and, if so, the amount.

B. *Events Giving Rise to this Lawsuit.*

Central to this lawsuit is a wide divergence between the parties' perceptions of the material facts. Mr. Herron argues, with factual support, that his performance

as a production supervisor was consistently very good. He makes this claim by focusing on his production numbers and on supervisory comments based on those numbers. Meanwhile, DaimlerChrysler focuses, also with factual support, on what it calls Mr. Herron's "volcanic" personality and other character traits such as a supercilious attitude and an inability to get along with employees and other supervisors. While DaimlerChrysler does not contest Mr. Herron's contention that his production levels were good, it claims that it found need for improvement in his performance based on these non-production deficiencies. Manufacturing Manager Bill Schaefer, who occupied a position two levels above in Mr. Herron's chain of command, summarized these perceived deficiencies in February 1999. After Mr. Herron filed a complaint with Daimler-Chrysler's Workplace Diversity Group, Mr. Schaefer wrote in response to questions posed by workplace diversity investigator Marvin Moore:

> I think Gary is an average supervisor[.] By that I mean he will get the job done, he knows what needs to happen overall to supply his customer with the requirements. Sometimes getting that done, he isn't as professional as I would like to see. I think he lacks the human element in working with people. A lot of times he feels no matter at what cost, whether dollars and [cents], or whose toes he steps on or how hard, his focus is on making the task successful, even at the cost of relationship problems. He causes a lot of controversy[,] more directed at the human element than is necessary to get the job done. He is not a people's person, thinking he will take the authority to get the task done himself. Most of his conflict is related to people.

Def. Ex. C (Schaefer Dep.) pp. 34–35; *quoting* Schaefer Dep. Ex. 10. Also see Larry Hall Dep. Ex. 7.

Thus, for example, Mr. Herron points out that in 1997, when he worked in Department 8600 under the supervision of Richard Huffman, Mr. Huffman was obviously impressed by Mr. Herron's ability to generate production and to keep his employees engaged in the production process. Mr. Huffman also rated him highly for being "completely bias free" with respect to his employees and for his encouragement of workplace diversity. Mr. Herron points to Mr. Huffman's favorable comment that, "for six months Gary Herron carried the department for me." There were times when Mr. Huffman would ask Mr. Herron to build 1100 parts knowing that he had the production capacity to produce only 800. "[B]ut he would do it," Huffman enthused. Schaefer Dep. Ex. 5.

Similarly, Mr. Herron notes that for the first eleven months of 1999, Department 8100 lost several thousand builds. Supervisors Steve Degenkolb and Jason Barnes were responsible for a significant percentage of the lost builds. Within a month of Mr. Herron becoming a supervisor in Department 8100, the department did not lose any builds. In sum, states Mr. Herron: "Plaintiff never failed to produce the parts he was required to produce while in Department 8100." Herron Aff., ¶ 35. Yet supervisors Degenkolb and Barnes were rated "significant contributors" for 1999, while he was not.

While Mr. Herron focuses on his demonstrated ability to generate production, DaimlerChrysler points to instances in which Mr. Herron's attitude and personality interfered with workplace relations among employees and supervisors. Thus, for example, On May 23, 1996, Mr. Herron met with Area Manager Ron Abney after an hourly employee named Chelly Landis

complained to Mr. Abney that Mr. Herron was rude and unprofessional. Mr. Abney informed Mr. Herron that he had received complaints not only from Mr. Landis, but from other employees. Mr. Herron requested a meeting with management. The next day, a meeting was held among Messrs. Abney, Mullins, and Manufacturing Manager Bill Schaefer. Mr. Mullins's memo of this meeting noted that Mr. Herron's conduct at the May 24 meeting mirrored his conduct during the March 28 meeting. According to Mr. Mullins, Mr. Herron was not listening to what the others were saying, he interrupted them when they attempted to speak, and he did not show them any respect. Def. Ex. A (Herron Dep. Ex.) 10.

Following the May 24 meeting, Mr. Herron was disciplined and placed on a paid leave of absence. That day, he requested and received the phone number for DaimlerChrysler's workforce diversity office in Auburn Hills, Michigan. Workforce diversity is an independent department at DaimlerChrysler's headquarters with companywide responsibility for investigating complaints of discrimination and harassment. Mr. Herron called and spoke with Eugene Hatton. Def. Ex. A (Herron Dep.), pp. 81–83.

Also following the May 24 meeting, Mr. Schaefer wrote a memo to Complex Personnel Manager Ron Lasecki, in which he recommended that Mr. Herron be removed from supervision:

> My analysis of Gary Herron's behavior during my involvement concludes he does not recognize his responsibility for respect of authority for his supervisor. He also displays no consideration for positive working relationships with co-workers. It is evident that Gary believes he is right and that everyone else is wrong. My recommendation is to remove Mr. Herron from supervision.

Def. Ex. A (Herron Dep. Ex.) 10.

Mr. Herron also was informed at this time that he was being placed on a 30/60/90 day performance improvement program. Mr. Abney told him that he needed to improve his teamwork with other supervisors and hourly workers, and he needed to correct his attitude toward supervisors. In August, Mr. Abney noted an improvement in Mr. Herron's behavior, thus satisfying the terms of the 30/60/90–day evaluation.[1]

According to DaimlerChrysler, the improvement was short-lived. It is undisputed on the record that, on January 10, 1997, Mr. Herron was involved in a workplace dispute that resulted in a five-day disciplinary layoff. Human Resources Administrator M.J. Tuberty wrote to Human Resources Executive T.C. Willoughby about the incident. Def. Ex. A (Herron Dep. Ex.), 12–15. Mr. Herron had ordered some third shift employees to run certain parts; the employees did not want to comply because they thought the parts were irregular. Ed Wallace, an area manager, discussed the incident with Mr. Herron. Mr. Wallace reported to Mr. Abney that Mr. Herron referred to Mr. Wallace as "an arrogant motherfucker" during his meeting with Mr. Herron; Mr. Herron denies

---

1. Mr. Herron does not dispute any of DaimlerChrysler's factual recitation. He offers an abbreviated discussion of the events, stating: When Plaintiff was involved in a dispute or confrontation he was counseled and told he was not a team player. At the end of May 1996 Plaintiff was put on a 30/60/90 review. During the 30/60/90 day review Plaintiff was evaluated on a scale from 1 to 4 with 4 being the best rating. After the first 30 days Plaintiff was graded 3 out of 4. After 60 days Plaintiff was graded 4 out 4. At the end of the 30/60/90 review Ron Abney concedes that any problems Plaintiff had were not caused by Plaintiff. Pl. Opp., p. 8.

having made that statement. Mr. Wallace sent Mr. Herron home, but Mr. Herron disregarded the order. As a result of this January 10, 1997, incident, Mr. Herron received a five-day disciplinary layoff that started on February 3, 1997. Def. Ex. A (Herron Dep. Ex.), 12–15. Mr. Herron contacted the company's Workplace Diversity Group after the suspension. Eugene Hatton of the Workforce Diversity Group asked Mr. Herron whether he wished to file a charge. Mr. Herron decided not to do so.

In July 1998, Mr. Herron and Area Manager Ed Wallace had a confrontation. At that time, Mr. Herron was the supervisor in Department 8600, and Richard Cage was the supervisor in Department 8800. Mr. Cage, who was the heat treat supervisor, told Mr. Herron not to move a certain set of parts until after the parts had been inspected. Mr. Cage then took one of the parts to the lab to check it for hardness, and it checked soft. When Mr. Cage returned to get another part, Mr. Herron had already shipped the parts, and Mr. Cage told him that he should never ship parts before they had been okayed through heat-treat inspection. Mr. Cage contacted Mr. Wallace to locate the suspect parts. Mr. Herron refused to listen, argued, and walked off angrily when Mr. Wallace attempted to talk with him. Def. Ex. A (Herron Dep. Ex.) 21.

The conflict between the parties' divergent points of view—Mr. Herron's focus on his productivity and DaimlerChrysler's focus on Mr. Herron's attitude and personality—came to a head in connection with Mr. Herron's 1998 evaluation. Richard Huffman, Mr. Herron's supervisor, rated Mr. Herron a "significant contributor." Manufacturing Manager Schaefer, however, ordered Mr. Huffman to lower the rating. According to Mr. Huffman, Mr. Schaefer "weighed [Mr. Herron's] ability to interact with his fellow supervisors and areas managers within the plant more heavily than what I did." Def. Ex. E (Huffman Dep.), p. 33. Mr. Huffman has testified that he agreed with Mr. Schaefer's suggestion to downrate Mr. Herron's performance. *Id.* Mr. Herron acknowledges that Mr. Schaefer explained his suggestion "because he felt Plaintiff's attitude, behavior and attendance should be taken into consideration equally with production results." Pl. Opp., p. 9, citing Schaefer Dep., p. 28.

Mr. Herron also presents evidence showing that, in addition to evaluating him in 1998, Mr. Huffman also evaluated Heather Peggs, Gerardo Sanchez, Clintonia Barnes and Eric Lorenz. Ms. Peggs and Mr. Lorenz are Caucasian. Mr. Sanchez is Hispanic. And Ms. Barnes and Mr. Herron are African–American. As Manufacturing Manager, Mr. Schaefer reviewed the evaluations of these other employees as well as Mr. Herron's. Mr. Huffman's comments regarding how well these supervisors met their goals and responsibilities were almost identical as to all of these employees. The combined behavior rating for Mr. Herron, Ms. Peggs, Mr. Sanchez, and Ms. Barnes was 2.9 on a 4.0 scale. For Mr. Lorenz, the overall behavior rating was 2.7 out of 4.0. Yet Mr. Lorenz and Ms. Peggs were rated "significant contributor," while Mr. Herron, Mr. Sanchez, and Ms. Barnes were rated "contributor." Schaefer Dep. Ex. 3, 6–9.

Similarly, while Mr. Herron's productivity was, as we have noted, impressive, Jason Barnes, the first-shift supervisor in Department 8600 at the same time that Mr. Herron was the second shift supervisor of that department, was rated a "significant contributor" for the calendar year 1998. Mr. Barnes is white. Once again, Mr. Huffman's comments on Mr. Barnes's

1998 evaluation are the same as for Mr. Herron.

In December 1998, Larry Hall, an African–American, succeeded Bill Schaefer as Manufacturing Manager. Mr. Herron does not dispute DaimlerChrysler's assertion that Mr. Hall thought that Mr. Herron was having problems with his area manager. In an effort to remedy the situation, Mr. Hall contacted every area manager in the plant, both black and white, and none of them would take Mr. Herron. (Ex. B: Hall Dep., pp. 43–45 & Ex. 7).

In January 1999, Area Manager Mark Carie attempted to talk with Herron about his attendance. Mr. Herron says that he had missed only three days that year. Moreover, he says, he was working long overtime hours and had even made it to work during snow storms. Mr. Herron was, obviously, distressed by Mr. Carie's questioning about his attendance. According to DaimlerChrysler, Mr. Herron would not listen; he interrupted and became belligerent. (Ex. A: Herron Dep., pp. 159–160 & Ex. 23).

Mr. Herron does not dispute the following facts.[2] The following day, Mr. Herron met with Larry Hall and Mark Carie. Mr. Hall read a disciplinary write-up known as a "Statement A" to Mr. Herron. The Statement A pertained not to Mr. Herron's attendance, but to his belligerence in meeting with Mr. Carie. Mr. Herron refused to sign the Statement A and left the plant. (*Id.*, pp. 160–166, 168–169 & Exs. 23–24). Mr. Herron testified that he had Hall's permission to leave. According to DaimlerChrysler, Mr. Hall told Mr. Herron that he was not being instructed to leave and that, if he did leave, it would be Mr. Hall's decision as to whether Herron would be allowed to return. (*Id.*, Ex. 23; *see also* Ex. B: Hall Dep., Ex. 7). Mr. Hall and

Mr. Carie viewed Mr. Herron's leaving the meeting as a voluntary resignation. (Ex. A: Herron Dep., Ex. 23).

Mr. Herron testified that, during the January 13, 1999 meeting, he said that he wanted to speak with someone in DaimlerChrysler's Workforce Diversity group. (Def. Ex. A (Herron Dep.), pp 166, 169–170). Mr. Herron called workplace diversity and spoke with Marvin Moore, who took extensive notes on Mr. Herron's complaints. Def. Ex. A (Herron Dep. Ex.) 26.

Mr. Moore informed Mr. Herron that he would come to Kokomo on February 8, 1999, to conduct an on-site investigation. (*Id.*, p. 206 Ex. 26 at p. 2, Ex. 27). Mr. Herron wrote to Mr. Moore on February 3, 1999, stating that he wanted to file a formal charge about the discipline he had received on May 31, 1996, February 3, 1997, and January 13, 1999; he also wanted to complain about the 2 percent pay raise he received in 1997. (*Id.*, pp. 208, 210–216 & Ex. 27). Mr. Moore came to Kokomo and met with Mr. Herron later in February. (*Id.*, pp. 216–217).

Mr. Moore interviewed several employees during his on-site visit. According to the notes from those interviews, Mr. Schaefer believed that he and Herron had a good working relationship. Mr. Schaefer also observed that Mr. Herron lacked the human element in working with people, that he caused more controversy with other employees and supervisors than was necessary to get the job done, and that he sometimes did not respect the chain of command or the authority of others. Mr. Schaefer also believed that there was more to being a good supervisor than just making parts, whereas Herron was so focused on making parts that he did not care what he said or did to other people. Def. Ex. C

---

**2.** In deposition testimony, Mr. Herron responded that, while he remembered the meet-ing, he did not recall the incidents. Def. Ex. A (Herron Dep.) pp. 162–165.

(Schaefer Dep.), pp. 34–36, 40–41, 47; Schaefer Dep. Ex. 10.

Larry Hall was also interviewed by an investigator from the Workforce Diversity Group. Def. Ex. B (Hall Dep.) pp. 42–43; Hall Dep. Ex. 7. According to the notes from that interview, Mr. Hall also noted that Mr. Herron had problems in his personal interactions, and that he had developed a reputation as someone who was difficult to work with. None of the area managers, black or white, wanted Herron to work for them. *Id.* pp. 53–55; Ex. 7. Mr. Hall testified:

> As a manufacturing manager, getting parts to assembly is a big part of your job, but doing well as a supervisor entails more than just moving parts. It entails people skills, communicating with your fellow supervisors, and entails communicating with all people alike. All that encompasses being a good supervisor. Hall Dep., p. 54.

After conducting his interviews, Mr. Moore concluded: "No findings of race or any discrimination! No action!" Def. Ex. A (Herron Dep. Ex.) 34.

After several more incidents involving clashes of personality, a meeting was scheduled on November 4, 1999, at Mr. Herron's request, to hear his complaints of discrimination and harassment. Mr. Herron did not show up at the meeting. Def. Ex. A (Herron Dep.) pp. 347–351; Herron Dep. Ex. 39. Mr. Herron testified that he was not given the correct time for the meeting and that he preferred to take his complaints to the EEOC which would subpoena his records. *Id.*, pp. 348–350, 351.

According to a memo prepared by Craig T. Dukes, Senior Manager for Human Resources, Mr. Herron was asked to document his specific complaints of discrimination and harassment prior to leaving on vacation so that the company could initiate an investigation into them. Mr. Herron made no such report. He testified that he did not recall Mr. Dukes making the request. Herron Dep., pp. 352–53; Herron Dep. Ex. 39.

On December 2, 1999, Mr. Herron was issued a "Statement A" for failing to submit to his supervisor information required for his annual appraisal. Herron Dep., p. 359; Herron Dep. Ex. 43. Mr. Herron would not sign the Statement A. Id., pp. 277, 359–360 & Exs. 29, 43, 44.

On December 14, 1999, Mr. Herron wrote a letter to Michele Cook at the Workforce Diversity Group, in which he complained again about harassment and discrimination. Def. Ex. A (Herron Dep.), pp. 366–375; Herron Ex. 48. Specifically, Mr. Herron pointed to a wide (and repetitive) variety of incidents which he perceived as unjust:

- not being given access to his personnel file in a timely manner;

- not being given a chance to answer "charges" against him;

- Mr. Moore conducted an inadequate investigation;

- the written report of January 13, 1999;

- his 1998 performance appraisal, specifically Bill Schaefer's downgrading of his performance rating;

- two days of lost pay because he left the January 13, 1999 meeting with Mr. Hall and Mr. Carie;

- being shuffled from department to department and from shift to shift;

- "constant pay shortages";

- "isolation from the rest of the plant";

- "increased harassment via letters in the mail, and others";

- "altering my attendance records";

- "altering performance to make it appear that I am not completing tasks";

• being asked repeatedly about working for another company.

Ms. Cook responded to Mr. Herron's complaint in a letter to Mr. Herron dated April 18, 2000. She concluded that, "based on our investigation, we could not conclude that unlawful discrimination, harassment or retaliation had taken place." Herron Dep., pp. 376–77; (Herron Dep. Ex. 50).

Mr. Herron resigned from Daimler-Chrysler in a letter to Human Resources Manager Craig Dukes of June 6, 2000. Mr. Herron had secured other employment before quitting DaimlerChrysler.

Mr. Herron filed two EEOC charges alleging race discrimination, harassment, and retaliation, both during his employment: one on February 1, 2000, the next on April 19, 2000.

### III. *Discussion.*

#### A. *The Standard on Summary Judgment.*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir.1998).

On a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party demon-strates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Id.* at 322–23, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in his favor on a material question, then the court must enter summary judgment against him." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265; *Anderson,* 477 U.S. at 249–52, 106 S.Ct. 2505, 91 L.Ed.2d 202).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge,* 24 F.3d at 920. Therefore, in considering a motion for summary judgment, we draw all reasonable inferences in favor of the non-movant. *Venters v. City of Delphi,* 123 F.3d 956, 962 (7th Cir.1997). If genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See *Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but mandated. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548, 91 L.Ed.2d 265; *Waldridge,* 24 F.3d at 920.

#### B. *Title VII and Section 1981.*

■ Before turning to a discussion of Mr. Herron's claims, we address two related issues of law that affect Mr. Herron's constructive discharge claim: the first in-

volves the requirement that the plaintiff exhaust administrative remedies; the second involves the question of whether an at-will employee has a cause of action for constructive discharge pursuant to section 1981.

Mr. Herron pursues his claim of race discrimination under two separate statutes. Substantive analysis of race discrimination under section 1981 and Title VII are the same. *Lalvani v. Cook County, Illinois,* 269 F.3d 785, 789 (7th Cir.2001); *Bratton v. Roadway Package System, Inc.,* 77 F.3d 168, 176 (7th Cir.1996). But Title VII involves administrative requirements that section 1981 does not.

■ DaimlerChrysler correctly points out that before a plaintiff may file a federal complaint pursuant to Title VII, he must first have filed a timely EEOC charge and that the allegations contained in the complaint must be "like or reasonably related to" the allegations that were contained in the charge. *Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535, 550 (7th Cir. 2002). This rule both "afford[s] an opportunity for the EEOC to settle the dispute between the employee and employer and put[s] the employer on notice of the charge against it." *Id., quoting Harper v. Godfrey Co.,* 45 F.3d 143, 147–48 (7th Cir. 1995). The rule "means that the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals." *Haugerud v. Amery School Dist.,* 259 F.3d 678, 689 (7th Cir.2001), *quoting, Cheek v. W. & S. Life Ins. Co.,* 31 F.3d 497, 501 (7th Cir. 1994). The "like or reasonably related" standard also includes issues that may reasonably be expected to grow out of an EEOC investigation of the charges. *Peters,* 307 F.3d at 550.

Mr. Herron filed two EEOC charges. The first, filed on February 1, 2000, alleged discrimination and harassment based on race, and retaliation for complaining within DaimlerChrysler about the discriminatory treatment. Def. Ex. 50. The second, filed on April 19, 2000, also alleged race discrimination and retaliation, this time for having filed the first EEOC charge. Def. Ex. 54. The first charge contains far more detail. It alleges, for example, that Mr. Herron experienced harassment and undeserved discipline; that he was "shuffled from department to department" and "from shift to shift"; that he had his pay docked for production shortages; that his time and attendance records were altered to create a more convenient reality for DaimlerChrysler. The second charge appears to have been filed primarily for the purpose of alleging retaliation based on having filed the first charge.

Mr. Herron nowhere addresses Daimler-Chrysler's argument that his EEOC charge is insufficient to support his Title VII constructive discharge claim. Mr. Herron was still employed at Daimler-Chrysler when he filed both charges. He did not leave the company until June 6, 2000, more than four months after he filed his first, more substantive charge, and about seven weeks after filing the second. Since Mr. Herron was still employed, neither charge contains a reference to a "discharge" of any kind—neither actual nor constructive. Nor can we infer from either charge—particularly the first—that the facts alleged reasonably could have led the EEOC to investigate a constructive discharge or put DaimlerChrysler on notice of a constructive discharge. In anticipation of an issue that we will address in more detail later, we note that to prove a constructive discharge Mr. Herron must show that his working conditions had become "intolerable," so that a reasonable employee in his shoes would have felt compelled to resign. We find the four month

delay between alleging harassment and finally quitting his job inconsistent with notice of a constructive discharge, particularly in view of the fact that he filed a second charge that is substantively on all fours with the first. Accordingly, we conclude that Mr. Herron's constructive discharge claim is not like or reasonably related to any allegations contained in either of his EEOC charges. It follows that Mr. Herron may not pursue his constructive discharge claim pursuant to Title VII.

■ In contrast to Title VII, section 1981 does not contain an administrative exhaustion requirement. Mr. Herron's constructive discharge claim is actionable under section 1981, unless it is barred for some other reason. DaimlerChrysler argues that, pursuant to the Seventh Circuit's decision in *Gonzalez v. Ingersoll Mill. Mach. Co.*, 133 F.3d 1025 (7th Cir. 1998), section 1981 does not permit Mr. Herron's constructive discharge claim. It reasons that, because section 1981 deals with "contracts," since the employment relationship here was "at-will," and since no one interfered with Mr. Herron's right to end his contract with DaimlerChrysler, then his employment relationship with DaimlerChrysler was not contractual. It follows that section 1981 does not apply to constructive discharge claims.

Without rehearsing the arguments in detail, we follow the well-reasoned examples of virtually all of the courts that have rejected this argument. *See Turner v. Arkansas Insurance Department*, 297 F.3d 751, 758 and 758, n. 6 (8th Cir.2002) (collecting cases and finding that fifteen of nineteen published decisions had held that an employee at will can sue under section 1981). Under Indiana law, employment—even employment at will—is, by definition, a contractual relationship. Accordingly, we have no difficulty concluding that Mr. Herron may bring his constructive discharge[3] claim pursuant to section 1981. *See Pettis v. Alexander Graphics, Ltd.*, 52 F.Supp.2d 950, 952–953 (S.D.Ind.1999) (Hamilton, J.), relying on *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048 (5th Cir.1998) (a Texas case in which the pertinent employment law is identical to Indiana's).

## C. Mr. Herron's Race Discrimination Claim.

■ A plaintiff may establish a case of race discrimination using either direct or indirect evidence. Where, as here, Mr. Herron makes no claim to direct evidence, he may proceed indirectly through the burden-shifting method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Mr. Herron must first establish a prima facie case. If he does, he raises a presumption of discrimination which the defendant must rebut by producing evidence of a legitimate nondiscriminatory explanation of its adverse em-

---

**3.** Although DaimlerChrysler wishes to distinguish constructive discharge from other kinds of adverse employment actions, the rationale articulated in *Gonzalez* itself indicates that section 1981 gives rise to a variety of actions after the formation of the employment contract, including "the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 133 F.3d at 1034, quoting H.R. Rep. 102–40(II), at 37, *reprinted in* 1991 U.S.C.C.A.N. 549, 730–31. Clearly, a constructive discharge is a "termination of a contract."

ployment action. If DaimlerChrysler meets that burden, Mr. Herron must establish that the reasons proffered by the defendant were pretextual, by presenting evidence from which a trier of fact may reasonably infer that his race played a role in the challenged action or that the employer offered a phony explanation. *See Freeman v. Madison Metropolitan School Dist.*, 231 F.3d 374, (7th Cir.2000); *Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir.2000).

### a. *The Prima Facie Case.*

 In order to establish a prima facie case of race discrimination, Mr. Herron must present evidence showing that: (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) at least one similarly-situated employee, not in his protected class, was treated more favorably. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885–886 (7th Cir.2001).

Mr. Herron's race discrimination claim founders at the most fundamental level. He cannot establish even a prima facie case of race discrimination because the actions taken against him do not rise to the level of "materially adverse employment actions." The Seventh Circuit has repeatedly reminded that "the adverse action must materially alter the terms and conditions of employment." *Stutler v. Illinois Department of Corrections*, 263 F.3d 698, 703 (7th Cir.2001), *quoting Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir.1996). For Mr. Herron to make a plausible prima facie case, we would have to assume, contrary to settled law, that a downgraded performance review in 1998 and receiving a "Needs Development" rating on his 1999 evaluation are adverse employment actions. *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir.1996); *Oest v. Illi-*

*nois Dept. of Corrections*, 240 F.3d 605, 611 (7th Cir.2001). We would also have to assume, contrary to law, that being transferred from department to department, with no change in salary, benefits, or responsibilities, is a materially adverse employment action. *Stutler*, 263 F.3d at 703; *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir.2001). We would also have to assume, contrary to law, that receiving a 30/60/90 improvement plan because of poor management skills is a materially adverse action. *Sweeney v. West*, 149 F.3d 550, 555 (7th Cir.1998) ("Absent some tangible job consequence accompanying those reprimands, we decline to broaden the definition of adverse employment action to include them"). Considering, together, all of the incidents that Mr. Herron refers to in support of his claim of race discrimination—and, as we address later in this entry, his harassment and retaliation claims—we cannot conclude that Mr. Herron was ever subjected to a materially adverse employment action. Accordingly, his complaint fails at the prima facie level.

Nevertheless, since DaimlerChrysler has offered a legitimate, non-discriminatory explanation of why it took the actions it took, we proceed to the pretext phase of the analysis. *E.g., Peele v. Country Mutual Insurance Co.*, 288 F.3d 319, 329 (7th Cir.2002); *Flores v. Preferred Tech. Group*, 182 F.3d 512, 515 (7th Cir.1999);

### b. *Evidence of Pretext.*

 Once a prima facie case is established, DaimlerChrysler bears the burden of producing admissible evidence of a legitimate, non-discriminatory reason for its employment actions. DaimlerChrysler explains that it took its actions against Mr. Herron because of his management style: his inability to get along with employees and other supervisors, his disregard for the opinions and suggestions of his superi-

ors, his know-it-all attitude with respect to the plant's operations. This is a legitimate, nondiscriminatory explanation for why DaimlerChrysler took the actions that it took. It is also supported by abundant evidence on the record. Accordingly, the burden of production shifts back to Mr. Herron to show that DaimlerChrysler's explanation is pretextual. *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006–1007 (7th Cir.2002). To do so, Mr. Herron must specifically address the reasons offered by DaimlerChrysler. *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir.2001); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001); *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 399 (7th Cir. 1998).

▪ Mr. Herron cannot simply avoid DaimlerChrysler's explanation. He must meet it squarely and show that it is a dishonest explanation, a lie, a deceit used by DaimlerChrysler to disguise its unlawful motive. *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir.2001); *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir.1998). He must "call the employer's honesty into question by rebutting the reason given." *Sweeney v. West*, 149 F.3d 550, 555 (7th Cir.1998). Because evidence of motive is crucial to a discrimination case, "the pretext inquiry focuses on whether the employer's stated reason was *honest*, not whether it was *accurate*." *Helland v. South Bend Community School Corp.*, 93 F.3d 327, 330 (7th Cir.1996) (emphasis added), *cert. denied*, 519 U.S. 1092, 117 S.Ct. 769, 136 L.Ed.2d 715 (1997).

▪ Mr. Herron may raise an inference of pretext by presenting evidence showing that DaimlerChrysler's articulated reason for taking its adverse actions either: (1) had no basis in fact; or (2) did not actually motivate the actions; or (3) was insufficient to motivate the actions. *Hoffman–Dombrowski v. Arlington Intern. Racecourse, Inc.*, 254 F.3d 644, 652 (7th Cir.2001); *Velasco v. Illinois Dept. of Human Serv.*, 246 F.3d 1010, 1017 (7th Cir.2001).

Mr. Herron does not so much challenge DaimlerChrysler's factual statements as deny that they are true and present an alternative set of facts. In other words, Mr. Herron does not attempt to satisfy the first or third prong of the pretext analysis: to show that the explanation had no basis in fact; nor that the company's reasons for taking the adverse actions against him were insufficient to warrant the actions. Nor does he present evidence from which a jury could conclude that a similarly-situated employee (an uncooperative supervisor with a haughty demeanor and a "volcanic" personality), not in the protected group, was treated more favorably.[4] Mr. Herron is left with the second prong of the pretext analysis: it wasn't the real explanation.

▪ The Supreme Court has reminded us that, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the em-

---

4. Mr. Herron's complaint prompts us to anticipate comparative evidence to support his argument. The complaint alleges that: he was transferred from department to department more frequently than similarly-situated white supervisors; he was transferred from one shift to another more frequently than similarly-situated white supervisors; his pay was docked when the pay of white supervisors was not; white production supervisors with poorer performance evaluations were given higher raises. Complaint ¶¶ 9–11, 13. Notwithstanding this promise of comparative evidence, the only evidence he presents of similarly-situated white employees being treated more favorably is treated immediately below; it turns out to be unfounded.

ployer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Here, however, Mr. Herron offers no evidence to raise a suspicion that DaimlerChrysler's explanation was false. Accordingly, he cannot leap this hurdle.

Mr. Herron does offer a facially significant piece of evidence that gives us pause. He shows that, in addition to evaluating him in 1998, Mr. Huffman also evaluated Heather Peggs, Gerardo Sanchez, Clintonia Barnes and Eric Lorenz. Ms. Peggs and Mr. Lorenz are Caucasian. Mr. Sanchez is Hispanic. And Ms. Barnes and Mr. Herron are African–American. As Manufacturing Manager, Mr. Schaefer reviewed the evaluations of these employees as well as Mr. Herron's. Mr. Huffman's comments regarding how well these supervisors meet their goals and responsibilities were virtually the same as to all of these employees. The combined behavior rating for four of these employees was 2.9 on a 4.0 scale; for Mr. Lorenz it was a 2.7. Yet Caucasian employees Lorenz and Peggs were rated "significant contributor," while minority employees Herron, Sanchez, and Barnes were rated "contributor."

DaimlerChrysler argues that Mr. Herron's argument is flawed with respect to these facts. It points out—correctly—that *Mr. Huffman* cannot be guilty of discrimination against Mr. Herron because he, after all, rated Mr. Herron a "significant contributor." It wasn't until Mr. Schaefer asked him to downgrade Mr. Herron that Mr. Herron's evaluation changed to "contributor." [5]

Although Mr. Herron does not consider the following in his argument, we note that, while this explains Mr. Huffman's conduct, it doesn't explain Mr. Schaefer's. As we observed in discussing Stip. Ex. 1, the evaluation form, the notations "significant contributor" and "contributor" pertain to the supervisor's *productivity.* "*Behavior*" is rated separately. It is uncontested that Mr. Huffman rated Mr. Herron, Ms. Peggs, Mr. Sanchez, and Ms. Barnes at 2.9 overall with respect to "Behavior"; he rated Mr. Lorenz a 2.7. DaimlerChrysler offers no explanation as to why Mr. Schaefer would downgrade Mr. Herron in a *productivity* category because of Mr. Herron's alleged *bad attitude,* when attitude is assessed on a different scale. In other words, a jury could reasonably conclude, based on this evidence, that Mr. Schaefer's motive was less than pure in downgrading Mr. Herron's performance.

The problem with this example is that downrating an employee's evaluation simply is not an "adverse employment action." *Smart v. Ball State University.,* 89 F.3d 437, 441 (7th Cir.1996); *Oest v. Illinois Dept. of Corrections,* 240 F.3d 605, 611 (7th Cir.2001) ("Only those acts resulting in adverse employment actions are cognizable under Title VII."). While Mr. Herron believes he was the victim of continuous mistreatment at DaimlerChrysler, "not everything that makes an employee unhappy is an actionable adverse action." *Smart,* 89 F.3d at 441. Mr. Herron did not experience a cognizable adverse employment action: that is, a material change in his employment such as a termination of employment, a demotion, a failure to promote, a significant job reassignment, or a

---

**5.** DaimlerChrysler also notes that Mr. Huffman went out of his way to help Mr. Herron. On February 17, 1999, Mr. Huffman noted that he was responsible for removing two disciplinary notices from Mr. Herron's file. Mr. Schaefer, while skeptical, agreed to the

removal. According to Mr. Huffman, however, the move was not popular. "Everyone says I made a mistake, from the Plant Manager on down. Everyone says they could have fired him." Def. Ex. C (Schaefer Dep. Ex.) 5.

significant change in benefits. *See Stutler v. Illinois Department of Corrections,* 263 F.3d 698, 703 (7th Cir.2001); *Ribando v. United Airlines,* 200 F.3d 507, 510 (7th Cir.1999).

Unless the poor evaluation leads to some consequence, some "material harm"—such as a failure to promote, a failure to get a raise, a demotion, a discharge—it does not fall within the ambit of an adverse employment action. *Haugerud v. Amery Sch. Dist.,* 259 F.3d 678, 691 (7th Cir.2001); *Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1039 (7th Cir.1998); *Sweeney v. West,* 149 F.3d 550, 555 (7th Cir. 1998).

Not only did Mr. Herron experience no harm as a result of the downgraded evaluation, it is uncontested that he received a raise in 1999, notwithstanding the downgrading. Indeed, the 1999 raise following the down-rated evaluation of 1998 was higher—both as a dollar amount and as a percentage of his salary—than the raise he had received in 1998 after being rated a "significant contributor" in 1997. (It is uncontested on the record that Mr. Huffman rated Mr. Herron a "significant contributor" in 1997 and Mr. Schaefer let it stand. (Schaefer Dep. Ex. 3.) Additionally, he received a higher salary in 1999 than either Mr. Lorenz or Ms. Peggs, the two Caucasian employees, notwithstanding the fact that they were rated higher in behavior. Def. Ex. F (Smith Aff.), 8; Def. Ex. L (Smith Suppl. Aff.) ¶¶ 5–6). A jury simply may not infer discrimination on the basis of race when the same decision maker suggests that the plaintiff be down rated in performance yet gives the employee his highest raise yet, especially when the raise is higher than those given to similarly-situated white employees.

Similarly, Mr. Herron points to Jason Barnes, a white employee who was treated more favorably. Mr. Herron tells us that Mr. Barnes produced fewer parts than Mr. Herron did, yet Mr. Barnes was rated a "significant contributor" in 1998 while he was rated "contributor." Mr. Herron presents no evidence to support the proposition that he was actually more productive than Mr. Barnes. Even if he had, it is clear that Mr. Schaefer did not recommend lowering Mr. Herron's rating based upon *parts production;* he suggested that Mr. Herron should be down-rated because of his *management style and inability to get along with others.* There is legally insufficient evidence from which a jury might infer that Mr. Barnes (or any of the other allegedly similarly-situated employees) had the kinds of inter-personal problems that characterized Mr. Herron's supervisory style. Accordingly, a jury could not reasonably infer that Mr. Herron and Mr. Barnes were similarly situated. It is also uncontested that Mr. Huffman testified that he thought Mr. Barnes a better performer than Mr. Herron "because Barnes encompassed all aspects of Safety, Quality, Delivery, Cost and Morale (known as SQDCM) into his job performance." Def. Ex. M (Huffman Dep.), pp. 14–15.

Given these uncontested facts, we find it impossible to view any of these actions— the downgrading of Mr. Herron's 1998 performance evaluation, the apparent disparity between Mr. Herron and the white supervisors who were rated more highly, the "Needs Improvement" rating in 1999, his being "shuffled" from department to department and from shift to shift—as a materially adverse employment action cognizable under Title VII. Even if we could make that determination, however, a jury could not reasonably conclude from the paucity of evidence that the company's actions were motivated by a discriminatory animus, or, stated differently, that its explanation of its action is a pretext for discrimination.

D. *Mr. Herron's Race Harassment Claim.*

 Title VII and section 1981 [6] protect employees against hostile environment workplace harassment. Harassment is actionable if "it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Clark County School District v. Breeden,* 532 U.S. 268, 121 S.Ct. 1508, 1509, 149 L.Ed.2d 509 (2001), *quoting Faragher v. City of Boca Raton,* 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). To determine whether harassment is actionable, we consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark County,* 121 S.Ct. at 1510. The test for determining whether harassment is actionable is both subjective and objective; the plaintiff must establish both that a reasonable person would find the harassment created an abusive working environment and that he, in fact, did perceive it to be so. *Gentry v. Export Packaging Co.,* 238 F.3d 842 (7th Cir.2001).

We addressed Mr. Herron's allegations at length in our discussion of his race discrimination claim and do not repeat the allegations here. Suffice to say that Mr. Herron's harassment claim is that all of the adverse actions taken against him were part of a campaign of harassment. We conclude, however, that Mr. Herron's proof of harassment is legally inadequate for two basic reasons. First, all of his allegations, taken together, do not rise to the level of actionable harassment. And second, it is a well-established principle of employment discrimination law that a cause of action for harassment must be based on some protected characteristic, here race.

First, we are hard pressed to conclude that Mr. Herron was subjected to a campaign of harassment based on race when none of the actions of which he complained, nor all of them together, rises to the level of discriminatory treatment. As we previously discussed, they do not amount to adverse employment actions according to well-settled Seventh Circuit law. In other words, on the basis of the evidence of record, we cannot conclude that the company's actions "unreasonably interfere[d] with [Mr. Herron's] work performance." See, *Twisdale v. Snow,* 325 F.3d 950 (7th Cir.2003) ("Title VII does not create a remedy against harassment as such; the harassment must—this is explicit in the statute—amount to discrimination 'with respect to [the employee's] compensation, terms, conditions, or privileges of employment.'" 42 U.S.C. § 2000e–2(a)(1).)

 Second, the issue of whether the work environment is hostile "turns on whether the alleged harassment occurred *because of the [race] of the complainant.*" *Haugerud,* 259 F.3d at 692 (emphasis added). That is, it turns on whether the employee was "'exposed to disadvantageous terms or conditions of employment to which members of the other [race were] not exposed.'" *Id. quoting Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

Mr. Herron offers insufficient evidence to raise a reasonable inference that any of the actions about which he complains happened to him *because of his race.* While

---

6. *Gonzalez v. Ingersoll Mill. Mach. Co.,* 133 F.3d 1025, 1033 (7th Cir.1998) reflects Congress's intent that section 1981 include claims of harassment. *Also see, Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 346 (7th Cir. 1999).

he is certainly not required to present direct evidence of race discrimination, he must provide *some* evidentiary basis for inferring that the company's actions were racially motivated. We find legally insufficient evidence to support that allegation. For example, he points to no similarly-situated Caucasian supervisor—a supervisory employee who did not get along with his employees or with management—who was treated any more favorably than he was. Perhaps most important, he nowhere attempts to rebut DaimlerChrysler's repeated assertion that it took the actions it took because of his poor management skills: his conflicts with employees and colleagues, his disrespect of company procedures and superiors in the chain of command; his lack of the human touch in managing employees. While he is not required to present comparative evidence, such evidence is "certainly helpful" in proving race discrimination. *Speedy v. Rexnord Corp.*, 243 F.3d 397, 402 (7th Cir.2001). Also see, *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 892 (7th Cir. 2001) "A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a pretext for racial discrimination." *Quoting Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir.2000); *Bellaver v. Quanex Corp.*, 200 F.3d 485, 493 (7th Cir.2000).

### E. *Mr. Herron's Retaliation Claim.*

■ In *Stone v. City of Indianapolis*, 281 F.3d 640 (7th Cir.2002), the Seventh Circuit clarified its standard for summary judgment in retaliation cases. The court outlined two methods for proceeding. The first, which need not detain us here, is that the plaintiff provides direct evidence of retaliation. The second, a variation on the ubiquitous *McDonnell Douglas* burden-shifting method, requires the plaintiff to present evidence showing that:

> after filing the [EEOC] charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment. Otherwise there must be a trial.

281 F.3d at 644.

The *Stone* case appears to hold that the plaintiff is required to present comparative evidence: evidence that a similarly-situated employee who did not complain of mistreatment was treated more favorably. As we noted earlier, Mr. Herron has provided no comparative evidence: no evidence of a similarly-situated employee (roughly, an uncooperative supervisor with a haughty demeanor and a "volcanic" personality), who did not complain of mistreatment,[7] but was treated more favorably. Accordingly, he cannot get past the prima facie phase.

■ Still, as we earlier proceeded to the issue of pretext with respect to Mr. Herron's discrimination and harassment claims, we do so here as well. Mr. Herron's allegations of retaliation include.

1. On January 15, 1999, Mr. Schaefer ordered Rick Huffman to lower Mr. Her-

---

7. Although *Stone* expressly involved retaliation against an employee for filing an EEOC charge, the same analysis should apply to retaliation against an employee who complained about discrimination or harassment in a different manner, such as filing an internal company grievance or complaint. *E.g., Dey*, 28 F.3d at 1458–1459.

ron's 1998 rating. Mr. Herron contends that this was in retaliation for his saying, during January 13, 1999 meeting with Larry Hall and Mark Carie, that he was going to contact DaimlerChrysler's Workforce Diversity Group. Mr. Herron, however, has produced no evidence to indicate that either Mr. Schaefer or Mr. Huffman even knew of Mr. Herron's contacting workplace diversity. Additionally, it is uncontested that Mr. Herron's 1998 evaluation, though *signed* on January 14, 1999, was *printed* on December 7, 1998. Def. Supp. Ex. J (Tuberty Aff.), ¶ 14; Tuberty Aff. Ex. 4. It follows that Mr. Schaefer had Mr. Huffman change Mr. Herron's evaluation from "significant contributor" to "contributor" about five weeks *before* Mr. Herron threatened to contact workplace diversity.

2. Mr. Herron contends that the "Needs Development" rating on his 1999, prepared, he alleges, by Larry Hall, was in retaliation for his filing charges of discrimination with workforce diversity in December 1999 and the EEOC in February 2000. The uncontested facts show, however, that Bentley Craig (and not Larry Hall) prepared Mr. Herron's appraisal. Additionally, causation is again made problematic by the fact that the first signature to appear on the evaluation appeared on November 11, 1999, a month before Mr. Herron contacted workplace diversity and three months before he filed his first EEOC charge (February 1, 2000).

3. Mr. Herron contends that he was shifted from department to department and from shift to shift in retaliation for complaining about job discrimination and harassment. As we noted earlier, however, the law is clear that assignments to lateral positions, without a change in the employee's terms and conditions of employment, simply do not rise to the level of an adverse employment action. *Stutler,* 263 F.3d at 702 ("a lateral transfer without a loss in benefits does not constitute an adverse employment action.") Mr. Herron has presented no evidence raising a reasonable inference that, as a result of his moving from department to department, he received less pay or even less prestige by virtue of the moves. Additionally, Larry Hall testified that, when he was Manufacturing Manager, he sought other departments for Mr. Herron, but that no one wanted him. Def. Ex. B (Hall Dep. Ex.) 7.

### F. *Mr. Herron's Constructive Discharge Claim.*

 We consider Mr. Herron's constructive discharge claim in the context of both his race harassment and retaliation claims. In other words, Mr. Herron argues his constructive discharge claim in the alternative, so that the constructive discharge could have been the result of the harassment based on race or the result of a campaign of retaliation for having complained. Under either scenario, in order to survive summary judgment on his constructive discharge claim, Mr. Herron must present evidence sufficient to raise a reasonable inference that his working conditions had become intolerable, either because the racial harassment had become so severe and pervasive or because the campaign of retaliation became so severe and pervasive that a reasonable employee in his shoes would have felt compelled to resign. *Grube,* 257 F.3d at 728 (constructive discharge based on sex); *Lindale v. Tokheim Corp.,* 145 F.3d 953, 955 (7th Cir.1998) (constructive discharge based on sex); *Berry v. Delta Airlines, Inc.,* 260 F.3d 803, 809–810 (7th Cir.2001) (retaliatory constructive discharge); *Knox v. Indiana,* 93 F.3d 1327, 1334 (7th Cir.1996) (retaliatory constructive discharge in which co-workers embarked on "a campaign of vicious gossip and profanity aimed at making 'her life hell' in response to her

complaints that a supervisor sexually harassed her.").

 If Mr. Herron's harassment and retaliation claims must fail as a matter of law so must his constructive discharge claim, which is based on the alleged harassment and/or retaliation. As the Seventh Circuit noted in *Sweeney*, 149 F.3d at 557–558, "an employee can be constructively discharged only if the underlying working conditions were themselves unlawful (i.e., discriminatory in some fashion)." *Citing Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1005–06 (7th Cir.1994) (holding that sex discrimination plaintiff had no viable constructive discharge claim because her working conditions—"even if intolerable"—had nothing to do with her sex). Since we have found legally insufficient evidence to indicate that "the underlying working conditions" were unlawfully based on race or the product of retaliation, we cannot find that they were sufficient to warrant his quitting employment and alleging a constructive discharge.

 Additionally, in order to prevail on a constructive discharge claim the plaintiff must present evidence of a "campaign" of abuse and hostility. *See, e.g., Stutler*, 263 F.3d at 703–704; *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1454–1455 (7th Cir.1994). Where, as here, the constructive discharge arises from an alleged hostile environment, the Seventh Circuit requires a showing of "aggravated" circumstances, factors that go beyond the underlying harassment. *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 657–58 (7th Cir.2001); *Rodgers*, 12 F.3d at 677.

Having found that Mr. Herron suffered no "adverse employment actions," as the phrase is interpreted in our circuit, we conclude that Mr. Herron's evidence of a constructive discharge is legally insufficient to survive summary judgment.

IV. *Conclusion.*

Mr. Herron has presented legally insufficient evidence to raise a genuine issue of material fact as to any of his four claims: discrimination, harassment, retaliation, or constructive discharge. Accordingly, we GRANT DaimlerChrysler's motion for summary judgment.